Richard A. Ramler
**Ramler Law Office, P.C.**
202 West Madison
Belgrade, MT   59714
Telephone: (406) 388-0150
Facsimile: (406) 388-6842
Email: RichardRamler@aol.com

Jon D. Robinson
**Bolen, Robinson & Ellis, LLP**
202 South Franklin Street, 2nd Floor
Decatur, IL  62523
Telephone: (217) 429-4296
Facsimile: (217) 329-0034
Email: jrobinson@brelaw.com

*Counsel for Plaintiffs*

(additional counsel listed on signature page)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

| | |
|---|---|
| ERIC HULEATT and ALLEN BOWKER, on behalf of themselves and all others similarly situated, ) ) ) | |
| ) | CASE NO. _____ |
| Plaintiffs, ) | |
| ) | |
| vs. ) | **CLASS ACTION COMPLAINT** |
| ) | **AND** |
| REMINGTON ARMS COMPANY, LLC., SPORTING GOODS PROPERTIES, INC. and E.I. DuPONT DE NEMOURS AND COMPANY, ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| ) | |
| Defendants. ) | |

_____

1

Plaintiffs, Eric Huleatt and Allen Bowker, by and through undersigned counsel, on behalf of themselves and all other entities and persons similarly situated, for their claim for relief against Defendants Remington Arms Company, LLC. ("Remington"), Sporting Goods Properties, Inc. ("SGPI") and E.I. Du Pont Nemours and Company ("DuPont") (collectively "Defendants") allege, upon information and belief and based on the investigation to date of their counsel, as follows:

## INTRODUCTION AND SUMMARY OF ACTION

1.      This is a class action asserting strict products liability – design defect, strict products liability – failure to warn, negligence, violation of the Magnuson-Moss Act, breach of express warranty, breach of implied warranty of merchantability, fraudulent concealment, unjust enrichment and seeking damages and declaratory relief in connection with the Remington Model 700 Rifles with the patented Walker Fire Control (the "Model 700 Rifles" or the "Rifles"), designed, manufactured, marketed, advertised and sold by Defendants.

2.      The patented Walker Fire Control was introduced in 1948 and is found in excess of 5,000,000 Remington brand firearms.

3.      Defendants designed, manufactured marketed, advertised, warranted and sold the Model 700 Rifle to Plaintiffs and the Class as well as the general public. In conjunction with each sale, Defendants advertised that the Rifles

2

were fit for the ordinary purpose for which such goods were used and were free from defects in materials and workmanship.

4.      As explained below, every Model 700 Rifle should be considered unreasonably dangerous and defective because it is prone to fire without pulling the trigger due to the defective design of the trigger assembly, which is known as the Walker Fire Control. (the "Defect").

5.      As discussed below, Defendants' knowledge of dangerous design flaws associated with the Walker Fire Control trigger assembly dates back to before the assembly was ever placed into the stream of commerce.[1]  The Rifles will fire without a trigger pull under a variety of circumstances due to the faulty design.   All of the Model 700 Rifles are defective and unreasonably dangerous.

6.      Despite decades of knowledge related to the dangerous conditions of the Model 700 Rifles, Defendants never issued an adequate warning or recall of the Model 700 Rifles.  Remington continues to falsely represent to the public that the Rifles are safe and reliable.

---

[1] Daily Progress Report – M/721 Pilot Line Inspection dated April 9, 1947, attached as Exhibit A.  As an initial matter, Plaintiffs are filing several documents under seal as Exhibits to this Complaint.  Some of these are or may be covered by protective orders from other cases.  We are filing these documents under seal without prejudice pursuant to any prior orders and we disagree that they should be confidential. We will meet and confer with the defendants on that issue and, if  unsuccessful in reaching an agreement, will file an appropriate motion.  To avoid redundancy, this footnote will not be repeated throughout the brief but shall apply to any and all attachments or Exhibits.

7.      Remington previously manufactured and sold a Model 600 series rifle which incorporated the basic Walker fire control design.  Only after one of the largest settlements ever awarded to an accident victim by a firearm manufacturer's insurance carrier in 1978 (*Coates v. Remington*), did Remington opt to recall the Model 600 series rifles when the alleged malfunctions associated to the Walker fire control and the settlement amount received wide publicity. Three years before the recall, Remington determined that 55.9 % of the Model 600 series rifles failed the "trick test" according to their internal testing sample of 615 rifles that they audited. The "trick test" was a test developed by Remington to determine whether the Rifles had adequate sear lift.  Inadequate sear lift can lead to interference between the connector and the sear which will allow the Rifle to fire without a trigger pull.[2] Inadequate sear lift is the result of only one of the design deficiencies of the Rifles.

8.      The Model 600 series exhibited the same safety-related malfunctions as the Model 700 Rifles because both fire control systems were built under the patent for the Walker Fire Control. The Walker fire control design is defective because the trigger and the safety operate in a parallel plane.  Further and relatedly, since the fire control incorporates a trigger connector, it fails to insure and maintain adequate engagement of the sear and trigger in a variety of circumstances. Remington failed to warn, retrofit or recall the Model 600 rifles until after the

---

[2] Process Record Change Authorization, dated February 2, 1973, attached as Exhibit B.

Coates settlement in 1978.  Even though the recalled Model 600 rifles employed a defective Walker Fire Control system as the Model 700 Rifles, the Walker system is still produced by Defendants for Model 700 Rifles. Defendants have not recalled Model 700 Rifles, and they continue to deny that these Rifles are defective.

### JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (Plaintiffs are citizens of Montana, Defendant Remington Arms, LLC is a Delaware corporation with its headquarters/principal place of business in Madison, N.C., Defendant Sporting Goods Properties, Inc. is a Delaware corporation headquartered in Wilmington, Delaware and Defendant, E.I. du Pont de Nemours & Company is a Delaware corporation headquartered in Wilmington, Delaware), (ii) the amount in controversy exceeds $5,000,000.00 (five million dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff class.

10.      Defendants conduct substantial business in Montana, including the sale and distribution of the Remington firearms, and have sufficient contacts with Montana or otherwise intentionally avail themselves of the laws and markets of Montana, so as to sustain this Court's jurisdiction over Defendants.

11.      Venue is proper in this district pursuant to 28 U.S.C. § 1391, *et*

*seq.* because a substantial part of the events or omissions giving rise to this claim occurred in the state of Montana. Venue is proper within the Missoula Division because Plaintiff Eric Huleatt is a resident of Missoula County, and much of the conduct which is the subject of this civil action was committed in Missoula County, Montana.

## PARTIES

12.    Plaintiff, Eric Huleatt ("Huleatt"), is and, at all relevant times was, a citizen and resident of Montana. Specifically, Huleatt resides in Missoula County, Montana. In 2000, Huleatt purchased a Remington Model 700 Rifle Serial No. A6724472 from Kesselring's Gun Shop in Burlington, Washington.

13.    Plaintiff, Allen Bowker ("Bowker"), is and, at all relevant times was, a citizen and resident of Montana. Specifically, Bowker resides in Roosevelt County, Montana. On or about March 6, 2006, Bowker purchased a Remington Model 700 Bolt Action Rifle Serial No. G6447372 from Bowker Gun Sales, in Fort Peck, Montana. Sometime after Bowker purchased the Rifle, while target shooting the Rifle near his home, he was closing the bolt and the Rifle suddenly and unexpectedly fired without a trigger pull.

14.    Defendant, Remington Arms, LLC ("Remington"), is a Delaware corporation with its headquarters/principal place of business, in Madison, N.C.

15.     Defendant Sporting Goods Properties, Inc. ("SGPI") is a Delaware corporation with its headquarters/principal place of business in Wilmington, Delaware.

16.     Defendant, E.I. du Pont de Nemours & Company ("DuPont"), is a Delaware corporation headquartered in Wilmington, Delaware. DuPont is a citizen of the State of Delaware. DuPont's principal place of business is located in Delaware, and all misrepresentations and omissions made to Plaintiff arise from a scheme or artifice devised and orchestrated primarily in Delaware. The defective Rifle was designed primarily in Delaware, New York and Connecticut.

17.     Defendant Remington, was, and is now engaged in the business of designing, manufacturing, assembling, distributing and selling firearms, and in this regard did design, manufacture, distribute, sell and, place into the stream of commerce, the Remington Model 700 Bolt Action Rifles including the action, fire control system, and safety, bearing Serial Number A6724472 and G6447372, knowing and expecting that said Rifles would be used by consumers and around members of the general public.

18.     Prior to November 30, 1993, DuPont owned 100% of the stock in the company known as Remington Arms Company, Inc., now known as Sporting Goods Properties, Inc. ("SGPI"). On or about November 30, 1993, Remington Arms Acquisition Corporation, Inc. ("RACI") purchased from DuPont substantially

all of the income producing assets of Remington Arms Company, Inc. (now known as SGPI), including the corporate name. The company formerly known as Remington Arms Company, Inc. changed its name to Sporting Goods Properties, Inc., and RACI changed its name to Remington Arms Company, Inc. SGPI retained certain non-income producing assets, some with significant environmental and other liabilities such that its net worth was reduced to a small fraction of its former so that SGPI may not be able to pay reasonable judgments in this and similar litigation.

19.    At all times pertinent to this action, SGPI and DuPont were and are the alter ego of each other and in essence constitute one legal entity in which SGPI operates as a division of DuPont. The separate incorporation of SGPI is a sham in that it is merely a corporate veil which insulates DuPont from liability for products manufactured and sold by SGPI. DuPont exerted, and currently exerts extreme influence, complete dominion, and/or absolute control over the corporate activity and function of SGPI. DuPont's continued operation of SGPI as a separate legal entity is a subterfuge designed to defeat public convenience, justify a wrong, perpetrate a fraud and/or otherwise work an injustice on Plaintiffs herein and the general public. The conduct of DuPont and/or SGPI has harmed or will harm Plaintiffs and the general public, justifying piercing of the corporate veil resulting

in DuPont being liable for the acts and omissions of SGPI as they are in reality one legal entity.

20.     Defendants Remington, SGPI, and DuPont are so intertwined contractually for the liabilities, past, present and future, of each other that they are, in fact, one entity and therefore, the corporate veils of each company should be pierced to properly ascertain the responsible parties for the allegations contained herein. The Asset Sale/Purchase Agreement transferring the assets of SGPI to Remington and various revised or supplemental agreements spreads responsibility and authority for product liability claims among the three entities as it is unclear who bears the contractual liability for the claims alleged herein.

21.     Remington and/or DuPont expressly and impliedly agreed to assume certain debts and responsibilities, including the product liability of SGPI by the terms of the Asset/Sale Purchase Agreement as well as the continuing relationship between Remington, DuPont and SGPI. Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

22.     Remington continues in the design, manufacture, distribution and sale of all Remington Arms product lines including the Model 700 Rifles, without significant changes. Remington maintains the same plants, employees, organization, contracts, customers, suppliers, advertising, products and name acquired in the asset

purchase. Remington acquired the entire company from SGPI through an asset/sale purchase in order to avoid and/or limit the liability resulting from an outright purchase of the stock from DuPont. Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

23.     Remington, DuPont, and SGPI acted fraudulently with respect to the asset/sale purchase in that its purpose was to avoid and/or limit the responsibility of DuPont and/or Remington for the debts of SGPI, particularly its product liability. Consequently, DuPont and/or Remington are the corporate successors to the product liability claims asserted, now and in the future, against SGPI, including this particular lawsuit.

24.    At all times pertinent to this action SGPI was an agent of DuPont acting in the course and scope of its agency relationship thereby making its principal, DuPont, liable for all of SGPI's acts and omissions, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

25.    At all times pertinent to this action, agents of DuPont, acting within the course and scope of their  agency relationship, controlled SGPI, thereby making SGPI's acts and omissions those of their principal, DuPont, either by exercising direct control over SGPI, or by adopting and ratifying SGPI's acts or omissions.

26.     B.R. Brown was the president of Remington and CEO of Consolidated Coal Company, a wholly owned subsidiary of DuPont, in 1993.  On September 2, 1993, Brown testified under oath that anytime a Model 700 Rifle fires without a trigger pull it is a serious safety problem:

> Q.  Mr. Brown, anytime that a gun fires without pulling the trigger you got a serious safety problem, don't' you?
>
> A.  If the gun would fire without pulling the trigger, I would say I had a safety problem.
>
> Q.  A serious safety problem; right?
>
> A.  Yes.[3]

27.     Brown also testified that Remington represents to its customers that the Model 700 Rifle will not fire unless the trigger is pulled:

> Q.  The gun is not supposed to fire unless you pull the trigger; right?
>
> A.  That is correct.
>
> Q.  That is the representation made to the customer is that the gun won't fire unless you pull the trigger; right?
>
> A.  Yes.[4]

28.     Finally, Brown testified that Remington makes a promise to its customer that a Model 700 will not fire unless the trigger is pulled:

---

[3] B. R. Brown Deposition, *Munoz v. Remington Arms Company, Inc.* and *Luna v. Remington Arms Company, Inc.,* page 102, lines 5 – 12, attached as Exhibit C.
[4] Id. page 103, lines 16 – 22, attached as Exhibit C.

Q.  All right.  Now, under the previous discussion that we had a few minutes ago, you promised, you say Remington promises that these guns won't fire unless you pull the trigger; right?

A.  Right.

## CLASS PLANTIFFS' INDIVIDUAL EXPERIENCES

29.    Plaintiff Huleatt purchased his Model 700 Rifle in 2000 in reliance on Defendants' representations that the Remington Model 700 Rifles were safe, reliable, high-quality firearms.

30.    In reliance on Defendants' representations regarding the safety and quality of Remington firearms, the seller of Huleatt's Rifle reassured him that his Model 700 Rifle was safe and reliable.

31.    In reliance on these representations and those others alleged herein, Huleatt purchased his Model 700 Rifle for about $400.00 (four hundred dollars).

32.    Despite his due diligence and because of the false impressions created by Defendants' misrepresentations and omissions regarding the safety and reliability of the Model 700 Rifles, Huleatt was unable to discover that his Rifle was defective until shortly before filing this complaint.

33.    Plaintiff Bowker purchased his Model 700 Rifle on or about March 6, 2006 for predator hunting in reliance on Defendant's representations that Remington manufactures well-known, reliable firearms.

34.    On or about October 29, 2010 Bowker contacted Remington after the CNBC Documentary (discussed below) aired to inquire about the safety and reliability of his Rifle. Bowker was told by a Remington representative that there was nothing wrong or defective with his Rifle or any of the Model 700 Rifles.

35.    Bowker relied on Remington's representation that his Rifle was reliable.

36.    While target shooting the Rifle near his home, Bowker was closing the bolt and the Rifle suddenly and unexpectedly fired without a trigger pull.

37.    Despite his due diligence and because of the false impressions created by Defendants' misrepresentations and omissions regarding the safety and reliability of the Model 700 Rifles, Bowker was unable to discover that his Rifle was defective until shortly before filing this complaint.

## COMMON FACTUAL ALLEGATIONS

## WALKER FIRE CONTROL TRIGGER ASSEMBLY DEFECT

38.    The Walker Fire Control trigger assembly is unique to the world of firearms and is exclusive to Remington brand products. The design utilizes an internal component known as a "trigger connector" or "connector". The Remington trigger design includes the connector as an additional part, which is a unique trigger design comprised of two distinctly different parts. The separate trigger connector design has not been adopted by any other rifle manufacturer. The connector rests on

top of the trigger body and is not physically attached to the trigger in any fashion, but is supposed to be held in place by tension from the trigger adjustment spring. (See Illustration 1). When the trigger is pulled, the connector is pushed forward by the upper member of the trigger body, which allows the sear to fall and rifle to fire. (See Illustration 2).



**Illustration 1**



**Illustration 2**

39.     The connector supports the sear to restrain the firing pin. The specified overlap or engagement of the connector and the sear is as little as 20/1000ths of an inch, which is approximately one-half the width of a dime, or eight human hairs.

15

When the rifle is fired, the connector is forced to rotate forward away from the trigger body.  During recoil, the trigger connector repeatedly separates from the trigger body in a chattering motion, creating a gap between the two parts. The gap between the trigger body and trigger connector can allow field debris, manufacturing scrap, burrs from the manufacturing process, lubrication applied at the factory, other lubrication build up, or moisture to become trapped inside the enclosed fire control housing, thereby restricting the return of the trigger connector to proper engagement under the sear. These circumstances and the resulting predisposition of the rifle to fire in the absence of a trigger pull are foreseeable and actually known by Defendants

40.     The separation of trigger and connector is also aggravated by various interferences between other parts of the fire control that are created by "tolerance stack up" during assembly at the factory,  or by loose manufacturing tolerances used by Remington for "ease of manufacture," or by insufficient parts inspection practices prior to assembly.

41.     Illustration 3 shows the result of reduced engagement caused by debris between the triggers and connector. Binding created by interference with other parts, or a bad trigger fit in the fire control can obstruct the reliable return of the trigger connector to proper engagement under the sear, which will create the same dangerous condition.



Illustration 3

42.     When the gap between the connector and trigger diminishes the engagement (overlap) of the two parts, the connector will no longer reliably support the sear. This then will allow the rifle to fire without a trigger pull. These unintended firings have been so common, even during Remington's own factory gallery testing of new guns, that Remington has adopted acronyms for the most common forms of malfunction *i.e.,* Fire on Bolt Closure "FBC"; Fire on Bolt Opening "FBO"; Fire on Safe Release "FSR"; and Jar off "JO", Fire off Safe "FOS" and "Fails to Fire."[5]

43.     Over the years, Remington has increased the specified overlap or engagement between the trigger connector and sear because of knowledge that

---

[5] Safety Malfunctions Gallery, 5/2/1975, attached as Exhibit D.

Model 700 Rifles can fire without a trigger pull, but Remington failed to employ a trigger block design to mechanically force and maintain adequate engagement between the trigger and sear.

44.     The Walker Fire Control design is defective because the Fire Control incorporates a trigger connector and because the design fails to properly insure adequate engagement of the sear in a variety of circumstances. The design deficiencies were first recognized by the design engineers during the initial development of this fire control system during the 1940s.  The design engineers specifically recommended that the Walker fire control include a "trigger block" safety to mechanically force secure engagement between the trigger, and sear to prevent the Rifles from firing without a trigger pull.

## **DEFENDANTS' KNOWLEDGE OF THE DEFECT**

45.     Merle H. (Mike) Walker was the principal design engineer of the Walker Fire Control.  He testified on January 26, 2011 as follows:

Q.  Did you participate in a program to consider trigger-blocking safeties for the Model 721?

A.  Yes.[6]

Q.  Tell us what a trigger-blocking safety is.  You told us about a sear-blocking safety.  Tell us how a trigger-blocking safety is different.

---

[6] Merle H. Walker Deposition, *Kinzer v. Remington Arms Company, Inc.*, January 26, 2011, page 13, lines 12 – 14, attached as Exhibit E.

A.  A trigger-blocking safety blocks the trigger from being moved when the safety is on.

Q.  What are the advantages that you think exit in a trigger-blocking safety?

A.  Advantages, it's unlikely that it will fail.

Q.  And when you say fail, what do you mean by that?

A.  The sear-blocking safety can fail when the parts are such that it – that the safety does not lift the sear off the trigger.

Q.  And was there some recognition early in the process that that that was a risk of the safety?

A.  Uh-huh.

Q.  The sear-blocking safety?

A.  Yes.

Q.  The effort to look at trigger blocking safeties was to fix that potential safety hazard?

A.  Was what?

Q.  Was the effort by you to look at trigger blocking safeties an effort to correct the risk associated with the sear-blocking safety?

A.  Yes.[7]
Q.  Were you convinced in 1948, Mr. Walker, that the trigger-blocking safety was workable?

A.  Yes.[8]

---

[7] Id. at page 13, line 19 – page 14, line 17.
[8]  Id. at page 15, lines 7 – 9.

46.     As admitted by Walker, Remington long ago recognized it was important to prevent any trigger movement when the rifle was in the on safe position to prevent the rifle from firing on release of the safety. This is proven by the company's statement in the patent for the Walker Fire Control which states:

> The value of any safety is proportional to the positiveness of its action. To this end we have found it to be essential that the safety means be so arranged that an inadvertent operation of the trigger while the safety in the 'safe' position will not condition the arm to fire upon release of the safety.[9]

47.    In 1977, Remington again acknowledged in a memo called "Fire Control Design Considerations" that using a "lift sear safety" design can result in the rifle firing off safe, as follows:

> This Safety lifts the Sear clear of the Trigger and blocks it so that, when the Trigger is pulled, it can not release the Sear.  This Safety is used on rifles where the Trigger movement is too small to effectively block.  It is especially useful on target rifles.

> Problems can occur with this Safety if the Trigger binds.  Foreign material in the Fire Control, or a bad trigger fit, can cause the Trigger to stick in the "pulled" position.  When the Safety is released, there is nothing to support the Sear, so the rifle fires off safe.[10]

48.     In the same 1977 memo, Remington acknowledges that a "Blocked Trigger Safety" "is the ultimate Safety because it blocks all of the functions

---

[9] Patent 2,514,981 granted to Merle H. Walker and Philip R. Haskell and assigned to Remington Arms Co. issued on July 11, 1950, attached as Exhibit F.
[10] Fire Control Design Considerations – Bolt Action rifles dated January 19, 1977, attached as Exhibit G.

required to fire the rifle."[11]  Remington again discussed the functional advantages of a trigger block safety almost two years later, when it acknowledged that adding a trigger block to the Walker Fire Control would be the "best solution to prevent the trigger from moving in the safe position", and to force adequate engagement of the trigger and sear to "eliminate the fail to reset possibility."[12]

49.    Remington engineers have admitted in product liability litigation throughout the country that materials can lodge between the connector and trigger, resulting in the connector being unable to support the sear. Indeed, Remington undertook several redesign efforts in the 1940s, 1970's, 1980s and 1990s,  trying to eliminate some of the situations in which the guns fire without a trigger pull, i.e. debris between trigger and connector, and binding of the connector which also reduces sear engagement.

50.    There is no engineering justification for using a connector which is not physically attached to the trigger. No other firearm manufacturer in the world utilizes such a separate connector; and many after-market manufacturers have created single-piece triggers to replace the defective Walker Fire Control system.

---

[11] Id.
[12] Bolt Action Fire Control Design Review, November 16, 1978, attached as Exhibit H.

51.     Mr. Walker testified that he designed the Walker Fire Control with the professional shooter in mind.[13]  He wanted a rifle with a "perfect trigger pull".[14] He said the extra connector served no engineering purpose other than to make operation of the trigger pull smoother for the professional shooter.[15]

52.     Acting on information as it had for years, in 2006 Remington began utilizing a new fire control system called the "X-Mark Pro." This design does not use a separate connector; and it incorporates a trigger block that forces and maintains engagement of the trigger and sear upon application of the safety.

53.     Despite all of the information Remington has received about thousands of complaints associated with the Walker Fire Control trigger assembly, it has not recalled the Model 700 Rifles.

54.     Defendants designed the Walker Fire Control trigger assembly and began manufacturing and distributing firearms containing that trigger assembly in 1948. Internal Remington documents show that prior to the production of the early Remington guns which included the Walker fire control system, Remington was aware the firearms were firing without a trigger pull.[16]

---

[13] Merle H. Walker Deposition, *Kinzer v. Remington Arms Company, Inc.*, January 27, 2011, page 78, lines 1 – 2, attached as Exhibit I.
[14] Id. at page 77, line 17.
[15] Id. at page 107, lines 7 – 14.
[16] *See, e.g.*, M.H. Walker, Memo: *Theoretical Unsafe Conditions of M/721 Safety* (Dec. 3, 1946), attached as Exhibit J; M. Walker, Memo: *M/721 Modification of Safety Design* (Aug. 16, 1948), attached as Exhibit K.

55.   Defendants have produced several models of firearms containing the Walker fire control. Most of these models are part of the Model 700 Rifle series. Over five million of these bolt action rifles have been sold since 1962.

56.   Defendants have made hundreds of millions of dollars since 1948 through sales of the Remington Model 700 series rifles.

57.   Defendants designed, manufactured, distributed, sold and, placed the Model 700 rifles into the stream of commerce knowing they would be used by consumers and in the presence of members of the general public.

58.   Almost immediately upon release of the Model 721 in March, 1948, Remington started receiving complaints from customers that the rifles unexpectedly fired when the safety was released. These complaints prompted the company to consider a trigger block safety feature for the fire control system. Remington engineers developed three alternate designs for a trigger block; Remington considered one of them as "the best design", but stated that "[i]ts disadvantage lay in the high expenditure required to make the conversion."[17]  The "high expenditure" referred to was $21,380 to make the conversion and a cost increase of 5 ½ cents per rifle.[18]

---

[17]  Progress Report, Model 721-722 Fire Control and Safety, August 25, 1948, attached as Exhibit L.
[18] Id. at pages 2 and 3.

59.    After the 1948 fire control modification study, Remington's attorney noted that "[o]ur usual potential liability for the safety of our product is somewhat augmented by our knowledge that some Model 721 safeties have malfunctioned. However, our liability does not seem to be out of proportion to the advantage of retaining the present sear and safety construction, pending receipt of further complaints from the field."[19]

60.    Remington decided to continue using the Walker fire control to avoid the "high expenditure" required to incorporate a trigger block in the design.

61.    In March 1968, six years after introducing the Model 700 Rifles to the consuming public, Consumer Reports wrote an article describing inadvertent discharges in the Model 700 Rifle:

> The sixth-ranked rifle, the Remington 700, exhibited a potentially dangerous flaw as first tested. There was so little clearance between the trigger and the trigger guard that when the trigger was pulled with the safety on (something you or a friend might do when sighting down the rifle or trying it for feel), the trigger sometimes failed to return to its forward position. **And with the trigger in the back position, the rifle would fire without warning the next time the safety was moved to the fire position**. The malfunction persisted for more than 100 firings before the trigger wore in and performed normally. An unwary buyer might have caused a serious accident by then.[20]

---

[19] A. J. Greene, Memo: *Model 721 Safety* (Aug. 31, 1948), attached as Exhibit M.
[20] Consumer Reports, *Varmint Rifles*, 157 (March 1968), attached as Exhibit N.

62.     According to an internal Remington memorandum, upper management at Remington reacted with "extreme displeasure" to the Consumer Reports article.[21]

63.     However, the problems outlined by the Consumer Reports article have proven to be true. Since 1968, Defendants have received thousands of complaints in the form of letters, telephone calls, and emails that Remington Model 700 Rifles fired without a trigger pull.[22]

64.     When Defendants recalled the Model 600 rifles in 1978, they recognized that similar unintended firings without trigger pulls were occurring with the more popular Model 700 Rifles. At that time, Remington contemplated conducting a similar recall of the Model 700 Rifles. However, internal documents show that Remington opted not to recall the Model 700 rifles because 2,000,000 firearms were already sold at the time. Remington concluded that "the recall would have to gather 2,000,000 guns **just** to find the 20,000 that are susceptible to this [tricking] condition."[23]

65.     This Remington document fails to consider the several other conditions and circumstances which Remington knew would contribute to firing without a

---

[21] C.B. Workman, Memo: *Statistical Method of Evaluating Firearms Design and Manufacture* (July 7, 1970), attached as Exhibit O.

[22] *See, e.g.*, J. A. Stekl, Memo: *M/700 Rifle Returns – Alleged Accidental Firings* (Jan. 25, 1990) (noting that the "number of Model 700 rifles being returned to the factory because of alleged accidental firing malfunctions is constantly increasing" and that as of January 25 "29 have been returned" that year), attached as Exhibit P.

[23] Minutes from Product Safety Subcommittee Meeting on January 2, 1979, at 4, attached as Exhibit Q.

trigger pull.  Remington's decision not to recall the Model 700 rifles was made with full knowledge that: "A common source of accidents with firearms is accidental discharge."[24] In the same company document Remington also acknowledges that: "A safety is provided to prevent accidental discharge."[25]

66.    Rather than recall both the Model 700 Rifles and the Model 600 rifles, Remington focused on creating a "safe gun handling defense" to the anticipated product liability claims caused by the unintended firings of Model 700 guns. Remington modified the "10 Commandments of Gun Safety" to shift responsibility for personal injuries or death to the gun handler. This was the beginning of Remington's attempt to blame the consumers, while hiding its knowledge of the Walker fire control design defect.[26]

67.    Remington's knowledge of the defective Walker fire control goes back more than 60 years.  Remington continued to develop safer alternative designs to the Walker fire control system throughout that time. A 1980 Remington Firearms Research Division document lists "fire control improvement" as a "necessity" "to reduce product liability".[27] Remington's new designs all centered on the concept of removing the floating connector and incorporating a trigger block to force and

---

[24] Safety Mechanism Shock Test, dated 1/9/69, attached as Exhibit R.

[25] Id.

[26] *See* Exhibit Q [product safety subcommittee mins], *supra* note 9 (noting that "an attempt to recall all bolt action rifles would undercut the message we plan to communicate to the public concerning proper gun handling" and "would indicate that the answer to accidental discharge can be found entirely within the gun . . .")

[27] Firearms Research Division – Firearms Programs, attached as Exhibit S.

maintain full engagement of the trigger and sear.  Remarkably, when it appeared Remington would change the defective design by including a safety to block both the trigger and the sear, it once again put profit over the health and safety of the public. On December 30, 1985, a Remington memo states "R & D is working on improved safety and security features which should have **marketable value**. (If they don't, we ought to stop the work.)."[28] Unfortunately, work on the new design stopped shortly after the issuance of this memo.   Hand-written notes on an October 19, 1993 document titled ("Liability Point of View") demonstrate that Remington is not concerned about safety, but only about having a "readily defensible reason for departure from current design."[29]

68.    In 1994, a jury rendered a $17 million verdict against Remington because of Model 700 defects. *Collins v. Remington Arms Co.*, Case No. 91-11-10856-cv (Maverick County, TX 1994). After the verdict, internal Remington documents asked: "IS THE RIFLE SAFE?"[30] At that time, Remington accountants determined that if only 30% of its customers actually returned the rifles as part of a nationwide recall of the Model 700 Rifles, it would cost Remington $22 million to conduct the recall.  Remington decided against the proposed recall.[31]

---

[28] Robert Darby, Memo dated Dec. 30, 1985, attached as Exhibit T.

[29] William A. Warren, Liability Point of View, dated October 15, 1993, attached as Exhibit U.

[30] Bolt Action Rifle Meeting notes dated September 19, 1994, attached as Exhibit V.

[31] Ken Green, Memo: *M/700 Trigger Replacement Campaign* (June 1, 1994), attached as Exhibit W.

69.     Remington documents from 1995 reveal that further efforts to redesign the Walker Fire Control trigger assembly were then underway. Remington's Fire Control Business Contract of January 27, 1995 provided:

> The goal is to provide a fire control that "feels" the same to our customers yet **provides additional safeguards against inadvertent or negligent discharges**.

> The purpose of the redesign of the fire control is to reduce the number of parts required, **lower cost** and to add design characteristics that enhance the safety attributes of our firearms.[32] (emphasis added):

But the project was doomed to failed even before it was started, considering the following comment under a section labeled: "Financial Analysis" from the same Remington document:

> This is where the rubber meets the road. Is the project worth doing?  What are the minimum forecasts to **insure profitability** and does our pricing structure support these expected profits.[33]

70.     Defendants' focus on profits was more important than achieving its Fire Control Requirements, which included "Prevent fire on safety release"[34], and "Solve FSR".[35]

71.     Remington's profit priority was described by Robert Haskin, Remington's former general counsel and vice-president of marketing, when he

---

[32]  Fire Control Business Contract, dated January 27, 1995, page 3, attached as Exhibit X.
[33] Id. at page 6.
[34] Fire Control Requirements, dated 3/28/95, attached as Exhibit Y.
[35] Fire Control Requirements dated 3/28/95, attached as Exhibit Z.

testified, "[i]t was my opinion that the new product was only worth doing if we could achieve certain goals, one of which was that **it costs the same or less**, another was that we could make certain improvements on the product, which you asked me to characterize, and I said my opinion could fairly characterized as **safety issues**."[36] Ultimately, Remington decided that any redesign of the Walker fire control should be focused on addressing safety issues, but ultimately, safety would take a back seat to profit.

72.    Remington possessed clear knowledge by the late 1990s that the Walker fire control was dangerous and defective. Despite this, it chose not to issue a public warning and not to recall the defective rifles. Instead, Remington introduced a new rifle series called the Model 710. While designing the Model 710 in 1997, Remington decided "not to use the M700 fire control".[37]

73.    A February 1998 memo shows that Remington considered the additional costs of using a safer trigger assembly. It determined that changing the trigger assembly would require "fairly substantial investments in capital and technical resources" in order to increase processing capabilities at Ilion, New York.[38] In May 1998, the new trigger design was put on hold by Remington "until

---

[36] Robert W. Haskin Deposition, *Bledsoe v. Remington,* page 237, lines 11-17, attached as Exhibit AA.
[37] Low Cost Bolt Action Rifle Project Description, dated 2/10/1997, attached as Exhibit BB.
[38] M/710 Preliminary Evaluation, dated February 21, 1998, attached as Exhibit CC.

economics and [the] project is approved."[39] Continuing its practice of putting profits over safety, on August 25, 1998, Remington abandoned implementation of a new and safer trigger design because of an "estimated cost increase."[40] Instead, to "eliminate development cost and time,"[41] Remington included the unsafe Walker Fire Control mechanism in the Model 710, and reversed its decision made just eighteen months earlier to "Not [use] the M700 fire control."[42]

74.   On multiple occasions during Remington's "gallery testing" of the Model 710 rifles, the rifles fired upon bolt closure, and they fired when the safety was moved from the safe to the fire position. Despite these test failures, Remington began selling its Model 710 rifle in 2000. Remington's pre-existing knowledge of the Model 710's dangers and defects led it to issue instructions to its customer service department on how to handle customers complaining of unintended firings.

75.   In 2000, 9-year-old Gus Barber was killed when his mother moved the safety on her Model 700 to the off position in order to unload her rifle.  This caused the rifle to fire without a trigger pull (an FSR). Gus Barber's death attracted nationwide attention; and Remington ultimately agreed to the Barber family request for a "safety modification program." The new program covered the Model 700 rifles produced prior to 1982 by removing a "bolt-lock" feature which required the

---

[39]   Sportsman Model 710 Bolt Action Rifle, dated 5/12/1998, attached as Exhibit DD.
[40]   Meeting Minutes, date 8/25/1998, attached as Exhibit EE.
[41]   M/710 Centerfire Bolt Action Concept Review 2, dated September 28, 1998, attached as Exhibit FF.
[42]   See Exhibit BB, note 37.

safety to be in the off position in order to unload the gun. However, this modification program addressed only the one issue of FSR in pre-1982 rifles. This modification failed to address the real defects in the Walker fire control that cause the rifles to fire without a trigger pull.

76.    Defendants acknowledge receiving 3,273 customer complaints about Remington Model 700 rifles firing without a trigger pull during the period from 1992 to 2004.[43] This is an average of almost five unintended firings per week for this twelve year period. The actual number of unintended firings during this period is probably much higher because not every consumer reports to Remington.

77.    In response to the complaints from consumers regarding unintended firings of the Model 700 Rifles without a trigger pull, Remington asked consumers to return their rifles for repair and testing. Remington consistently claimed it was unable to duplicate an unintended discharge.

78.    For example, Bud Caretti emailed Remington in 2005 stating that a Model 700 Rifle discharged without a trigger pull when his 15 year old daughter released the safety. Remington's response was "[w]e are not aware of the issue you experienced in the Model 700."[44]

## REMINGTON'S FRAUDLENT CONCEALMENT

---

[43] Summary of Customer Complaints in *Williams v. Remington*, attached as Exhibit GG.
[44] E-mail string Bud Caretti 12/04.2005, attached as Exhibit HH.

79.     As alleged in preceding paragraphs 3, 30, 33, 66, 77, and 78, Defendants' statements are false and fraudulent and made to deceive, and continue to deceive, consumers about the defects associated with the Rifles and to convince consumers that failures of the Model 700 rifles result from human error, either by pulling the trigger or poor gun maintenance.[45]

80.     Remington routinely blames the malfunctions on the condition of the rifle, due to rust, corrosion, poor maintenance, excess lubrication or "abuse" of the rifle. Remington's literature and Owner's Manual contain no warnings regarding "abuse" of Model 700 rifles, or about dangerous malfunctions. On the contrary, Owner's Manuals issued by Remington state, "The firearm will fire when the trigger is pulled." There is no warning that any condition may cause the rifle to fire without a trigger pull.

## THE CNBC DOCUMENTARY

81.     On October 20, 2010, after a ten-month investigation, CNBC aired a documentary entitled, "Remington Under Fire: A CNBC Investigation." The documentary examined allegations that the Model 700 rifles are prone to firing without pulling the trigger. CNBC noted that Remington "insists its rifle is safe, trusted, and reliable, though a trail of death and serious injury dating back decades has prompted critics to ask whether this iconic American company has

---

[45] *See, e.g.*, C. Prosser, Memo: *Gun Examination Report* (Apr. 26, 1971), attached as Exhibit II.

compromised safety in the name of profits, and gone too far in trying to protect its signature product."[46] During the documentary, Senior Correspondent Scott Cohn speaks to several gun owners who suffered devastating consequences from the defects in the Model 700 rifles.

82.     As part of its investigation for the documentary, CNBC interviewed Mike Walker, the Remington engineer who designed the Walker fire control trigger for the Model 700 Rifles. Walker's memos, obtained by CNBC, indicated he repeatedly raised concerns about the trigger system he designed.

83.     Other Remington documents show that Remington's own employees warned of dangerous defects. Test Engineer Wayne Leek warned in a memo: "[t]his situation can be very dangerous from a safety and functional point of view."[47]

84.     CNBC cited a 1948 memo from Walker where he proposed another design that's only "disadvantages lay in the high expenditure required to make the conversion." According to the memo, the cost of the conversion would have been $0.055 (5 ½ cents) per Rifle. Remington never made the conversion or recalled the rifles; and continued to insist the Walker fire control was not defective.

85.     As part of its investigation CNBC spoke with a former Remington employee whose job involved dealing with customer complaints related to the

---

[46] *See* Remington Under Fire: A CNBC Investigation, About the Show, http://www.cnbc.com/id/39554879/ (last visited May 8, 2013).
[47]  Daily Progress Report, M/721 Pilot Line Inspection, dated 4/9/47, attached as Exhibit A.

Model 700 Rifles. The former employee informed CNBC that he was instructed not to acknowledge any problem with the rifles, and said that if he had, he would have lost his job.

86.    Remington has responded to the numerous first-hand accounts of unintended firings by maintaining that the incidents were often the result of poor maintenance and unsafe handling - by inexperienced users.[48]

87.    Remington provided a written statement to CNBC before the documentary aired. This statement was mentioned during the program. It contained the following statements which Remington knew were false when they were made:

> The Model 700, including its trigger mechanism, has been free of <u>any</u> defect since it was first produced and, despite any careless reporting to the contrary, the gun's use by millions of Americans has proven it to be a safe, trusted and reliable rifle.[49]

> Both Remington and experts hired by plaintiff's attorneys have conducted testing on guns returned from the field which were alleged to have fired without a trigger pull, and neither has <u>ever</u> been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale.[50]

88.    After CNBC aired the documentary, Remington published several responses, including a website located at http://remington700.tv, an Official

---

[48] Remington, *Point by Point Response* (Oct. 29, 2010), available at http://www.remington700.tv/fileadmin/pdfs/point-by-point-response.pdf ("Point by Point Response").

[49] Remington Arms, Official Statement for CNBC Program Regarding the Model 700 (Sept. 7, 2010), available at http://www.remington700.tv/fileadmin/pdfs/OfficialStatement.pdf. ("Official Statement").

[50] *Id.*

Statement for CNBC Program Regarding the Model 700 Rifles, and a Point by Point Response to the CNBC documentary.

89.    Remington's responses contained false and deceptive statements intended to deceive the public, including a claim that the Model 700 rifles are safe and only fire without a trigger pull where they are improperly modified or improperly maintained. Remington's responses contained numerous statements that Remington knew were false, including:

> Recently CNBC produced an "expose" claiming that the trigger mechanism of the Model 700 rifle has a deadly design flaw.  This claim is demonstrably false;[51]

> Both Remington and experts hired by plaintiff attorneys have conducted testing on guns returned from the field, which were alleged to have fired without a trigger pull, and neither has ever been able to duplicate such an event on guns which had been properly maintained and which had not been altered after sale.[52]

> Each of the tragic and emotional personal injury and death cases cited by CNBC involve a breach of one or more important gun safety rules:

>> Failure to keep the rifle pointed in a safe direction
>> Failure to properly maintain the rifle
>> Altering the rifles trigger mechanism
>> Failure to have the safety engaged when not actively engaged in firing the rifle.[53]

> The Barber rifle had been modified in multiple ways and poorly maintained (rusted action). Even so, in testing by experts for both Remington and the

---

[51] Point by Point Response, *supra* note 48.
[52] Point by Point Response, *supra* note 48; *see also* Official Statement, *supra* note 49.
[53] Point by Point Response, *supra* note 48.

Barber family, the Barber rifle would fire only by pulling the trigger while the safety was in the fire position.[54]

The truth about accidental discharges is clear. These things don't go off by themselves. [55]

The Model 700, including its trigger mechanism, has been free of <u>any</u> defect since it was first produced and, despite any careless reporting to the contrary, the gun's use by millions of Americans has proven it to be a safe, trusted and reliable rifle.[56]

No scientific test has ever supported the accidental discharge theory of plaintiffs' lawyers and their expert. That's true, even with a gun at the center of the CNBC report.

The reporter tells the compelling story of the Barber family, who lost their son in a hunting accident a decade ago. But the show never reveals the condition of the gun, which experts found was heavily rusted, with the trigger engagement screw, safety lever, and fire control mechanism all adjusted, or removed and reinstalled.

The gun fired only when the safety was in the fire position and the trigger was pulled, exactly as it was designed to do.[57]

90.    In these responses, Defendants continued to falsely claim the Model 700 rifles can only fire without a trigger pull when they are improperly modified or improperly maintained.

91.    According to public records, there have been more than 140 lawsuits filed against Defendants involving serious injury or death which were caused by

---

[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] Chen, Joie, "*Remington's In-Depth Response to CNBC Under Fire,*"
http://www.remington700.tv/#, Tr. at [00:02:25;16]; [00;13:10;08]; and [00:03:18,27].

Remington bolt action rifles firing without a trigger pull.

92.     Defendants have intentionally concealed from Plaintiffs and the general public that the Model 700 Rifles are defective, while continually marketing the rifles as a safe and reliable products.

93.     Defendants have concealed their knowledge of the defective nature of the Model 700 rifles.

94.     Plaintiffs and un-named Class Members have reasonably believed that Model 700 rifles would only fire when the trigger was pulled based on Defendants' repeated misrepresentation that the guns were not dangerous or defective.

95.     As a result of Defendants' acts and omissions as detailed above, Plaintiffs and Class Members could not reasonably have known or discovered that Model 700's would fire without a trigger pull and were defective.

## CLASS ACTION ALLEGATIONS

96.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23, and case law thereunder on behalf of themselves and all others similarly situated, with the Class defined as follows:

> **All individuals residing in the State of Montana who own a Remington Model 700 Rifle originally manufactured and distributed with a Walker Fire Control Trigger Mechanism.**

Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) Remington Arms Company, LLC, and its

subsidiaries and affiliates; (c) all persons who properly execute and file a timely request for exclusion from the Class; and (d) persons claiming personal injuries as a result of the defect in the Remington 700.

97.     Plaintiffs reserve the right to modify or amend the Class definition, as appropriate. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims, and because this case meets the requirements of Federal Rule of Civil Procedure 23.

98. *Numerosity*: The Class is composed of thousands of persons geographically dispersed throughout the State of Montana, the joinder of whom in one action is impractical. The Remington Model 700 Rifles have been one of the most popular rifles (in terms of sales volume) in the United States. There are at least thousands of purchasers who have experienced the Defect and have been damaged by Defendants' conduct, as alleged herein. Moreover, upon information and belief, the Class is ascertainable and identifiable from Defendants' records or identifying marks on the Rifle.

99.     *Commonality*: The critical questions of law and fact common to the Plaintiff Class that will materially advance the litigation is whether the Rifle is inherently defective, contrary to the expectations imparted by Defendants through

their representations and omissions, and whether and how long Defendants knew of and concealed the Defect.

100.    Furthermore, other questions of law and fact common to the Class that exist as to all members of the Class and predominate over any questions affecting only individual members of the Class include the following:

a.  Whether the design of the Remington 700 allows the Rifles to fire without a trigger pull;

b.  Whether the design of the Remington 700 does not provide enough clearance between the sear and the trigger connector and thereby causes the Defect;

c.  Whether the design of the Remington 700 allows for excessive clearance between the trigger body  and the trigger connector and thereby causes the Defect;

d.  Whether the design of the Remington 700 allows lubrication buildup, moisture, rust, metal shavings from the manufacturing process, or other materials to become lodged between the trigger body and connector and cause the Defect;

e.  Whether the design of the Remington 700 fails to force and maintain adequate engagement between the sear and the trigger and causes the Defect;

f.  Whether the fire control and safety system of the Remington 700 operate on parallel planes causing the Defect;

g.  Whether the design of the Remington 700 allows the Defect to occur by opening or closing the bolt;

h.  Whether the design of the Remington 700 allows the Defect to occur by pushing the safety to the "off" position;

i.  Whether the design of the Remington 700 rifle will fail to fire if the fire control is not consistently lubricated, especially in cold climates;

j.  Whether the Defect is caused by "abuse" or improper gun maintenance;

k.  Whether the Defect is caused by adjustment of the fire control;

l.  Whether "abuse" or improper gun maintenance and improper adjustment of the Walker fire control are reasonably foreseeable;

m.  Whether Defendants should have warned Plaintiffs and other purchasers and likely users of the Defect;

n.  Whether Defendants have been unjustly enriched as a result of the conduct complained of herein;

o.  Whether Plaintiffs and the Class are entitled to equitable relief, including but not limited restitution;

p.  Whether the design or manufacturing of the Model 700 Rifles can cause the Defect, and thus the Rifles are not suitable for their intended use;

q.  Whether Defendants knew or should have known that Model 700 Rifles were defective;

r.  Whether Defendants had a duty to Plaintiffs and the Class to disclose the true nature of the Defect in the Model 700 Rifles;

s.  Whether Defendants falsely represented that the Model 700 Rifles were of a certain standard, quality, and grade, when in fact, they were not;

t.  Whether Defendants concealed material information regarding the true characteristics and defective nature of the Model 700 Rifles;

u.  Whether Defendants' false representations and concealment of the defective nature of the Model 700 Rifles was knowing, intentional, reckless, and/or malicious;

v.   Whether Plaintiffs and the Class are entitled to actual, statutory, punitive, exemplary, and/or other forms of damages, and/or other monetary relief and, if so, in what amount;

w.   Whether Defendants breached their express warranties to Plaintiffs and the Class;

x.   Whether Defendants breached their implied warranties to Plaintiffs and the Class; and

y.   Whether Remington Model 700 Rifles were purchased by Plaintiffs and all Class Members in a defective, unreasonably dangerous condition.

101.   *Typicality*: Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of Defendants' conduct in designing, manufacturing, marketing, advertising, warranting and selling the defective Remington Model 700 Rifles manufactured from 1962 to present that have experienced the Defect, and were damaged as a result. The universally defective nature of the Model 700 Rifles renders each Class member's clams, legal theory, and injury common and typical.

102.   *Adequate Representation*: Plaintiffs will fairly and adequately protect the interests of the members of the Class and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including but not limited to consumer class actions involving, among other claims, breach of warranties, product liability and product design defects.

41

103.    *Predominance and Superiority*: This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable. Should individual Class members be required to bring separate actions, this Court and/or courts throughout Montana would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## COUNT I
## STRICT LIABILITY – DESIGN DEFECT

104.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

105.   The Remington Model 700 Rifles were purchased by Plaintiffs and all Class Members in a defective, unreasonably dangerous condition in

42

violation of M.C.A. § 27-1-719.

106.   At all relevant times, Defendants were engaged in the business of designing, manufacturing, assembling, distributing, and selling firearms, and in this regard, did design, manufacture, distribute, sell and place into the stream of commerce the Remington Model 700 Rifles, knowing and expecting that the Rifles would be used by consumers including Plaintiffs and all Class Members.

107.   The Remington Model 700 Rifles were expected to and did reach Plaintiffs and all Class Members without substantial change in the condition in which they were sold.

108.   Defendants are strictly liable to Plaintiffs and all Class Members for damages resulting from Defendants' manufacture and sale of the Model 700 Rifles in a defective, unreasonably dangerous condition in violation of M.C.A. § 27-1-719.

109.   Specifically, Defendants' design was defective and unreasonably dangerous in one or more of the following respects:

a.    In designing a fire control with a "trigger connector";

b.    In designing a fire control and safety system that operate in parallel planes which permits a dangerous condition to exist;

c.    In designing a fire control with unacceptable manufacturing tolerance build up;

d.    In designing a fire control that failed to include pre-set engagement between the trigger connector and the sear;

e.    In designing a fire control that was susceptible to the accumulation of debris, lubrication build up, moisture, freezing, and/or the accumulation of rust;

f.    In designing a fire control that was susceptible to adjustment;

g.    In designing a fire control that was susceptible to the presence of manufacturing burrs or debris;

h.    In designing a fire control that will fire without a trigger pull;

i.    In designing a fire control that will fire when the safety is shifted from the "safe" to the "fire" position;

j.    In designing a fire control that will fire when the bolt is cycled;

k.    In designing a fire control that will "jar off";

l.    In designing a fire control that uses improper materials, including "powdered metal" for the sear that are unusually susceptible to normal wear and tear and have inappropriate frictional coefficients;

m.    In manufacturing a fire control that has burrs or manufacturing debris within the fire control;

n.    In manufacturing a fire control without proper or adequate quality control procedures or checks;

o.    In designing a fire control that cannot be reasonably inspected, cleaned or maintained by the customer.

110.  Defendants had a duty to create a product that was not in a defective condition unreasonably dangerous for its normal, intended, foreseeable use and would not result in injury to Plaintiffs and Class Members.

111.   Plaintiffs and the Class Members, acting as reasonably prudent people and exercising due diligence, could not have discovered that Defendants' Rifle was defective as herein mentioned or perceive its danger.

112.   By reason of the foregoing, Defendants are strictly liable to Plaintiffs and the Class Members for designing, manufacturing, and selling the Rifle.

113.   Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against the Defendants for compensatory damages for themselves and each member of the Class, for the establishment of the common fund, plus attorney's fees, interest and costs.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN

114.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

115.   At all relevant times, Defendants were engaged in the business of manufacturing Remington Model 700 Rifles.

116.   The Rifles were expected to and did reach Plaintiffs and the Class without substantial change to the condition in which it was designed, manufactured and sold by Remington.

117.   Defendants knew of the Rifles' propensity to unexpectedly and unintentionally fire without a trigger pull, yet Defendants failed to notify or warn Plaintiffs or Class Members of this propensity, either before or after the purchase of the Rifles.

118.   Neither Plaintiffs nor the Class Members recognized the propensity of the Rifles to fire without a trigger pull.

119.   Defendants owed a duty to Plaintiffs and Class Members to adequately warn of the Defect prior to and after the sale of the Rifles.

120.   Specifically, Defendants breached their duty to warn Plaintiffs and Class Members as follows:

121.   In failing to warn Plaintiffs and Class Members of the Rifles' potential to fire without a trigger pull;

122.   In failing to warn Plaintiffs and Class Members of the risks and hazards of improper maintenance of the Rifles;[58]

123.   In failing to warn Plaintiffs and Class Members of the risks and hazards of adjustment of the fire control;

124.   In failing to inform or advise Plaintiffs and Class Members of the proper procedures for maintenance of the Rifles;

---

[58] Remington has admitted to this allegation in internal documents. *See* C. B. Workman, Memo: *Gummed Triggers* (Oct. 13, 1980) ("We must investigate more fully – We do not warn about improper cleaning or improper lubrication of the fire control in our manual"), attached as Exhibit JJ.

125.   In failing to inform or advise Plaintiffs and Class Members of the proper procedures for adjustments to the fire control.

126.   By reason of the foregoing, Defendants are strictly liable to Plaintiffs and the Class Members for failing to provide adequate warnings regarding the Rifles.

127.   Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against the Defendants for compensatory damages for themselves and each member of the Class, for the establishment of the common fund, plus attorney's fees, interest and costs.

## COUNT III
## NEGLIGENCE

128.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

129.   Defendants had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, and marketing of the Rifles.

130.   Defendants breached their duty to Plaintiffs and the Class by designing, manufacturing, advertising and selling Rifles to Plaintiffs and the Class that are defective and have the propensity to fire without a trigger pull, and by

failing to promptly remove the Rifles from the marketplace or to take other appropriate remedial action.

131.   Defendants knew or should have known that the Rifles are defective, have the propensity to fire without a trigger pull, and otherwise are not as warranted and represented by Defendants.

132.   As a direct and proximate cause of Defendants' negligence, Plaintiffs and the Class have suffered actual damages in that they purchased a Rifle that is defective and that has the propensity to fire without a trigger pull. This Defect has rendered the Rifles valueless and caused, and will continue to cause, Plaintiffs and the Class to incur expenses repairing or replacing the Rifles as well as loss of use of the Rifles.

133.   Plaintiffs on behalf of themselves and all others similarly situated, demand judgment against Defendants for compensatory damages for themselves and each member of the Class, for establishment of a common fund, plus attorney's fees, interest and costs.

<strong><u>COUNT IV</u><br><u>VIOLATION OF MAGNUSON-MOSS ACT</u></strong>

134.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

135.   The Magnuson-Moss Consumer Products Liability Act, 15 U.S.C §2301, et seq. ("MMCPWA" or the "Act") provides a private right of action to purchasers of consumer products against retailers who fail to comply with the terms of a written warranty, express warranty and/or implied warranty.

136.   Plaintiffs and the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

137.   The Rifles are a "consumer product" as defined in 15 U.S.C. § 2301(1).

138.   Defendants are "warrantors" as defined in 15 U.S.C. § 2301(5).

139.   Defendants provided Plaintiffs and the Class with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

140.   These written warranties include Defendants' warranty which provided with the product sold to Plaintiffs and other members' of the Class, which states that Defendants warrant to the original purchaser of a new firearm that "your Remington firearm will be free from defect in material and workmanship." In the event a defect is found the purchaser must return the gun to the factory or an authorized warranty repair center at their own cost. Defendants then have the option to "repair the defect(s) or replace the firearm at no cost to you."

141.   Defendants have failed to remedy the defects of the Rifles despite knowledge of its dangerous condition and propensity to discharge without a trigger

pull. Additionally, Class Members have been required to pay a fee for both shipping and a replacement trigger once they notified Defendants of the Defect present in the Rifles.

142.   Defendants have been given a reasonable opportunity by Plaintiffs and other Class members to cure such failures and to comply with the warranty yet have repeatedly failed to so.

143.   Plaintiffs and the other members of the Class have suffered damages as a direct and proximate result of Defendants' breach of warranty.

144.   As demonstrated above, Defendants failed to comply with the terms of their warranties - written, express and implied - with regard to the Rifles that they manufactured, advertised, distributed, marketed and/or sold.

145.   By virtue of the foregoing, Plaintiffs and other members of the Class are entitled to an award of damages and other appropriate relief, including attorneys' fees.

## COUNT V
## BREACH OF EXPRESS WARRANTY

146.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

147.   Defendants expressly warranted that the Rifle is fully warranted against defects in workmanship and materials under normal use and service."

Defendants agreed "to repair the defect(s), or replace the firearm AT NO COST TO YOU." (emphasis in original).

148.   The Rifles, however, contain the Defect resulting in a malfunction when the trigger is not pulled. This Defect is due to fundamental design and manufacturing errors well within the Defendants' area of experience and is present when the Rifles leave the Defendants' control.

149.   When Plaintiffs made a warranty claim and provided notice to Defendants of the Defect in the Rifle, Defendants stated that Plaintiffs would be required to incur additional out of pocket expenses for payment of replacement trigger.

150.   Accordingly, Defendants failed to remedy the defective trigger as set forth in its warranty.

151.   The limitations of damages and the limitations contained in the express warranty provisions are harsh, oppressive and one-sided. The limitations related to the amount of damages, the type of remedies available to Plaintiffs and Class Members are unconscionable when Defendants knew or should have known that there are defects in the design and manufacturing of the Rifles.

152.   Defendants knew that the Rifles are prone to fire without a trigger pull, resulting in injury, death, and damage to other property, yet Defendants failed and

omitted to inform its distributors, its customers, Plaintiffs and Class Members who purchased their Rifles.

153. In light of the foregoing, Defendants' warranty failed its essential purpose and/or is unconscionable; therefore, Defendants' warranty with Plaintiffs and the Class was breached.

154. Also, Defendants' failure to remedy the defective triggers and all associated damages constitutes a breach of express warranty.

155. The foregoing breaches of express warranty at issue were substantial factors in causing damages to Plaintiffs and Class Members.

156. As a result of the foregoing, Plaintiffs and the members of the Class have suffered damages (including out-of-pocket expenditures for replacement trigger assemblies) that were directly and proximately caused by the defective design and construction of the Remington Rifles.

## COUNT VI
## BREACH OF IMPLIED WARRANTY

157. Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

158. At all times mentioned herein, Defendants designed, manufactured and sold the Model 700 Rifles and prior to the time said Rifles were purchased by

Plaintiffs, Defendants impliedly warranted to Plaintiffs and to Plaintiffs' agents, that the Rifles were of quality and fit for the use for which it was intended.

159.   Plaintiffs and Plaintiffs' agents relied on the skill and judgment of the Defendants in using the Rifles.

160.   The Rifles are unfit for their intended use and not of merchantable quality, as warranted by Defendants, in that they have propensities to fire without a trigger pull and fail to perform and protect when put to its intended use. The Rifles have caused Plaintiffs to sustain damages as herein alleged.

161.   Defendants designed and manufactured the Rifles using a defective trigger assembly. Defendants designed, manufactured, sold and placed the Rifles into the stream of commerce knowing and expecting that the Rifles would be used by consumers and around members of the general public. Defendants knew, or should have known, that its Rifles had a propensity to fire without a trigger pull.

162.   After Plaintiffs were made aware of their damages as a result of the aforesaid Rifle, notice was duly given to Defendants of the breach of said warranty.

163.   Defendants failed to provide adequate remedy and caused its implied warranties to fail of their essential purpose, thereby permitting remedy under implied warranties.

164.   As a direct and proximate result of the breach of said warranties, Plaintiffs and the Class members have suffered and will continue to suffer loss as alleged herein in an amount to be determined at trial.

165.   Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against Defendants for compensatory damages for himself and each member of the Class, for the establishment of the common fund, plus attorney's fees, interest and costs.

## COUNT VII
## FRAUDULENT CONCEALMENT

166.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

167.   At all times mentioned herein, Defendants, through their experience, were in a position of superiority to Plaintiffs and the class members and as such had the duty and obligation to disclose to Plaintiffs the true facts and their knowledge concerning the Rifles; that is that said Rifles are defective, have the propensity to fire without a trigger pull, and otherwise are not as warranted and represented by Defendants. Defendants made the affirmative representations as set forth herein to Plaintiffs, the Class, and the general public prior to (and after) the date Plaintiffs purchased the Rifles, while at the same time concealing the material defects

described herein. All of these facts were material to consumers' (such as Plaintiffs') purchase decisions, and were relied on in making these purchase decisions.

168.   The material facts concealed or not disclosed by Defendant to Plaintiffs and the Class are material facts in that a reasonable person would have considered those facts to be important in deciding whether or not to purchase Defendants' Rifle.

169.   At all times mentioned herein, Defendants intentionally, willfully, and maliciously concealed or suppressed the facts set forth above from Plaintiffs and with the intent to defraud as herein alleged.

170.   At all times mentioned herein, Plaintiffs and members of the Class reasonably relied on Defendants to disclose those material facts set forth above. If Defendants had disclosed the above facts to Plaintiffs and the Class and had they been aware of said facts, they would have either negotiated a lower price to reflect the risk or simply avoided the risk all together by purchasing a different rifle.

171.   Defendants continued to conceal the defective nature of their Rifle even after members of the Class began to report problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem.

172.   As a result of the previous and continued concealment or suppression of the facts set forth above, Plaintiffs and the Class members sustained damages in an amount to be determined at trial.

## COUNT VIII
## UNJUST ENRICHMENT

173.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

174.     Substantial benefits have been conferred on Defendants' by Plaintiffs and the Class and Defendants have appreciated these benefits.

175.     Defendants' acceptance and retention of these benefits under the circumstances make it inequitable for Defendants to retain the benefits without payment of the value to the Plaintiffs and the Class.

176.     Defendants by the deliberate and fraudulent conduct complained of herein, have been unjustly enriched in a manner that warrants restitution.

177.     As a proximate consequence of Defendants' improper conduct, the Plaintiffs and the Class members were injured. Defendants have been unjustly enriched, and in equity, should not be allowed to obtain this benefit.

## COUNT IX
## DECLARATORY RELIEF

178.   Plaintiff, individually, and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

179.     Defendants acted or refused to act on grounds that apply generally

to the Declaratory Relief Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole within the meaning of Fed. R. Civ. P. 23.

180.    Plaintiff seeks a declaration that:

181.   All Remington Model 700 bolt action rifle with the patented Walker Fire Control have defects which cause them to fire without a trigger pull;

182.   All Remington Model 700 bolt action rifle with the patented Walker Fire Control have a defect in workmanship and material that causes failures;

183.   Defendants knew of the defects in their Remington Model 700 bolt action rifle with the patented Walker Fire Control; and

184.   Defendants shall issue a recall of all Remington Model 700 bolt action rifles with the patented Walker Fire Control.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, Eric Huleatt and Allen Bowker, on behalf of themselves and all others similarly situated, pray for a judgment against Defendants as follows:

A.    Enter an Order certifying the proposed Class (and subclasses, if applicable), designating Plaintiffs as the named Class Representatives of the Class, and designating the undersigned as Class Counsel;

B.    Declare that Defendants are financially responsible for notifying all

Class members of the problems with the Remington Model 700 Rifles;

C.      Enter an Order enjoining Defendants from further deceptive advertising, marketing, distribution, and sales practices with respect to the Remington Model 700 Rifles and requiring Defendants to repair and/or replace Plaintiffs' and Class members' Remington Model 700 Rifles with a suitable alternative rifle of Plaintiffs' and Class members' choosing;

D.      Enter an award in favor of Plaintiffs and the Class that includes compensatory, exemplary or punitive damages, and statutory damages, including interest thereon, in an amount to be proven at trial;

E.      Declare that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Remington Model 700 Rifles or order Defendants to make full restitution to Plaintiffs and the members of the Class;

F.      Enter an award of attorneys' fees and costs, as allowed by law;

G.      Enter an award of pre-judgment and post-judgment interest, as provided by law;

H.      Grant Plaintiff and the Class leave to amend the Complaint to conform to the evidence produced at trial; and

I.      Grant such other or further relief as may be appropriate under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, Eric Huleatt and Allen Bowker hereby demand a trial by jury on

all claims so triable.

Dated this 4th day of June, 2013.

By: /s/Richard A. Ramler_____
        Richard Ramler
        **Ramler Law Office, P.C.**
        202 West Madison Avenue
        Belgrade, Montana 59714
        Telephone: (406)388-0150
        Facsimile: (406)388-6842
        Email: richardramler@aol.com

Jordan L. Chaikin
**Parker Waichman LLP**
3301 Bonita Beach Road, Suite 101
Bonita Springs, Florida 34134
Telephone: (239) 390-1000
Facsimile: (239) 390-0055
Email: jchaikin@yourlawyer.com

Jon D. Robinson
Christopher Ellis
**Bolen Robinson & Ellis, LLP**
202 South Franklin, 2nd Floor
Decatur, Illinois 62523
Telephone: (217) 429-4296
Facsimile: (217) 329-0034
Email: jrobinson@brelaw.com
Email: cellis@brelaw.com

John R. Climaco
John A. Peca
**Climaco, Wilcox, Peca, Tarantino & Garofoli Co., LPA**
55 Public, Suite 1950
Cleveland, OH 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
Email: jrclim@climacolaw.com
Email: japeca@climacolaw.com

Richard Arsenault
**Neblett, Beard & Arsenault**
2220 Bonaventure Court
Alexandria, LA 71301
Telephone: (800) 256-1050
Facsimile: (318) 561-2592
Email: rarsenault@nbalawfirm.com

Eric D. Holland
R. Seth Crompton
**Holland, Groves, Schneller & Stolze, LLC.**
300 North Tucker Boulevard, Suite 801
St. Louis, MO 63101
Telephone: (314) 241-8111
Facsimile: (314) 241-5554
Email: eholland@allfela.com
Email: scrompton@allfela.com

Charles E. Schaffer
**Levin, Fishbein, Sedran & Berman**
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
Email: cschaffer@lfsblaw.com

Timothy W. Monsees
**Monsees, & Mayer P.C.**
4717 Grand Avenue, Suite 820
Kansas City, Missouri 64112
Telephone: (866) 774-3233
Facsimile: (816) 361-5577
Email: tmonsees@mmmpalaw.com

W. Mark Lanier
**The Lanier Law Firm**
6810 F.M. 1960 Road West
Houston, TX 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
Email: wml@lanierlawfirm.com

*Counsel for Plaintiffs*